# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

BOWERMAN v RED OAK MANAGEMENT CO, INC

Docket No. 167718. Argued on application for leave to appeal December 10, 2025. Decided July 20, 2026.

Jan Bowerman brought an action in the Montcalm Circuit Court against Red Oak Management Co., Inc., Westveld Services, LLC, and Bob's Asphalt & Paving, Inc., after she sustained an injury when she stepped into a shallow trench near the trash-disposal area in the parking lot of Stanton Park Apartments, an apartment building for elderly and disabled individuals where she resided, while taking out her trash before sunrise on October 30, 2021. Red Oak managed Stanton Park and contracted with Westveld to replace concrete in the parking lot; Westveld created the trench when replacing the concrete slab underneath a dumpster in the parking lot, and testimony indicated that the trench remained uncovered and unmarked for several weeks after Westveld completed its work on October 21, 2021. Red Oak also contracted with Bob's Asphalt to fill in the trench with asphalt, but Bob's Asphalt did not complete this work until November 10, 2021. Bowerman brought a three-count complaint, alleging that Red Oak breached its covenant under MCL 554.139(1) to keep the premises and all common areas fit for the use intended by the parties and in a reasonable state of repair and that Westveld and Bob's Asphalt negligently failed to correct the trench or install adequate safeguards and warnings so that it would not constitute a trip hazard. Defendants each moved for summary disposition, and the trial court, Ronald J. Schafer, J., granted the motions under MCR 2.116(C)(10), holding that Red Oak did not breach its covenant under MCL 554.139(1)(a) because the trash-disposal area remained reasonably accessible and was therefore fit for the use intended by the parties and that Bowerman's claim against Westveld sounded in premises liability and, as a matter of law, Westveld did not owe Bowerman any duty of care because the trench was an open and obvious hazard that lacked special aspects rendering it unreasonably dangerous.

Bowerman did not challenge the trial court's order granting summary disposition in favor of Bob's Asphalt, but she appealed the order granting summary disposition to Red Oak and Westveld. In a split, unpublished per curiam opinion, issued September 12, 2024 (Docket No. 366338), the Court of Appeals, GADOLA, C.J., and K. F. KELLY, J. (MARIANI, J., dissenting), affirmed, holding that Red Oak did not breach its covenant under MCL 554.139(1)(a) to keep the common areas fit for the use intended by the parties because tenants retained reasonable access to the trash-disposal area and the trench was a "mere inconvenience" that did not negate the area's fitness for the use intended by the parties. The Court of Appeals further held that Bowerman's

claim against Westveld sounded in negligence rather than premises liability, such that Westveld had a duty to perform its work with ordinary care so as not to create an unreasonable risk of harm, and that Westveld did not breach its common-law duty as a matter of law. Bowerman sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on the application. ___ Mich ___; 21 NW3d 186 (2025).

In an opinion by Justice HOOD, joined by Chief Justice CAVANAGH and Justices BERNSTEIN and WELCH, and joined by Justice THOMAS as to Part III(A) only (concerning the claim of negligence against Westveld), the Supreme Court, in lieu of granting leave to appeal, *held*:

1. A genuine issue of material fact exists regarding whether Westveld breached its common-law duty to refrain from unreasonably endangering others, and the Court of Appeals therefore erred by affirming the trial court's order granting Westveld summary disposition of Bowerman's negligence claim. Viewing the evidence in the light most favorable to Bowerman, reasonable persons could conclude that Westveld personnel created an unreasonable risk of harm by digging the trench and leaving it uncovered and unmarked upon their departure from Stanton Park.

Michigan law distinguishes between claims based upon theories of ordinary negligence and those based upon premises liability. Premises-liability claims arise from the condition of the land at issue, and they are predicated upon the defendant's possession and control of such land. Ordinary negligence claims, on the other hand, are based on the underlying premise that a person has a duty to conform their conduct to an applicable standard of care when undertaking an activity. The Court of Appeals correctly held that Bowerman's claim against Westveld sounds in ordinary negligence rather than premises liability. Westveld lacked possession and control of the trash-disposal area when Bowerman's injury occurred; Bowerman's claim was therefore premised upon the alleged failure of Westveld's personnel to conform their conduct to the applicable standard of care associated with replacing the concrete platform underneath the dumpster.

The common law imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern their actions as not to unreasonably endanger the person or property of others. Generally, unless the court can conclude that *all* reasonable persons would agree the defendant did not create an unreasonable risk of harm, whether a defendant's conduct in the particular case breached this general standard of care is a question of fact for the jury to decide. In this case, the record reflects that Westveld created the trench and left it uncovered and unmarked. Westveld's owner acknowledged that the trench could pose a tripping hazard and that Westveld personnel typically marked conditions such as the trench with cones or caution tape. Westveld personnel also filled a different, smaller trench but did not fill the trench at issue. Furthermore, the Court of Appeals erroneously relied on evidence regarding Bowerman's acts and omissions; Bowerman's acts and omissions are relevant to her degree of comparative fault but do not establish, as a matter of law, that Westveld personnel acted in accordance with their common-law *duty* to refrain from unreasonably endangering others.

2. The Court of Appeals erred by concluding, as a matter of law, that Red Oak did not breach its covenant under MCL 554.139(1)(a). MCL 554.139(1)(a) provides that in every lease or license of residential premises, the lessor or licensor covenants that the premises and all common

areas are fit for the use intended by the parties. The parties in this case did not dispute that the trash-disposal area was a "common area" as provided in MCL 554.139(1)(a). Red Oak therefore had a statutory duty under MCL 554.139(1)(a) to keep the trash-disposal area fit for the use or uses intended by the parties. The appropriate inquiry under MCL 554.139(1)(a) is whether the common area in question is *fit* (i.e., adapted, suited, or appropriate) for the use intended by the parties under the circumstances of the specific case; the extent to which a hazard poses a mere inconvenience of access under *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 430 (2008), may be relevant, but it is not dispositive.

Stanton Park held itself out as specifically housing elderly and disabled tenants, and this narrow category of tenants matters because MCL 554.139(1)(a) requires courts to analyze the fitness of a common area not in the abstract but rather in light of the uses intended by the parties to a residential lease. There is a nexus between a common area's fitness and the particular tenants at issue. Accordingly, Red Oak had a statutory duty under MCL 554.139(1)(a) to ensure that elderly and disabled tenants had reasonable access to a means of disposing of their trash. The trench was uncovered and unmarked, and Red Oak did not install warnings or visual aids before Bowerman was injured. Furthermore, a property-management expert opined that the parking lot where the trash-disposal area was located was underlit, which supported Bowerman's testimony characterizing the trench as difficult to see in the predawn hours when her injury occurred. On these facts, because reasonable persons could conclude that the trench posed a hazard to the elderly and disabled tenants sufficient to render the trash-disposal area unfit for the use intended by the parties, a genuine issue of material fact exists as to whether Red Oak violated MCL 554.139(1)(a).

Reversed and remanded to the trial court for further proceedings.

Justice THOMAS, concurring in part and dissenting in part, concurred in full with Part III(A) of the majority opinion because she agreed that genuine issues of material fact exist as to Bowerman's common-law negligence claim against Westveld, but she dissented from Part III(B) of the majority opinion because she would conclude that no reasonable jury could find that the trench rendered the common area unfit under MCL 554.139(1)(a). She argued that, while the common law places a duty as to *any* condition on the land that creates an unreasonable risk of harm, the statutory covenant of fitness under MCL 554.139(1)(a) focuses on the fitness of the premises or common areas more broadly. While the trench was approximately 10 feet long, it was less than a foot wide, and tenants could easily avoid it when throwing away their trash or when walking through the parking lot to access a vehicle. The majority's analysis of Bowerman's statutory claim against Red Oak wrongly conflates the covenant of fitness in MCL 554.139(1)(a) with a common-law negligence duty and with the covenant of reasonable repair in MCL 554.139(1)(b).

Justice BOLDEN, joined by Justice ZAHRA, dissenting, would have held that Bowerman's claim against Westveld sounds in premises liability and fails as a matter of law given that Westveld did not possess and control the premises where Bowerman fell. Justice BOLDEN would have further held that even under ordinary-negligence principles, although a contractor possesses common-law duties while it is performing its work, such duties are limited to the scope of the work. Accordingly, Justice BOLDEN would have affirmed the Court of Appeals' judgment as to Westveld but for different reasons. As to Red Oak, Justice BOLDEN would have affirmed the Court

of Appeals' judgment as well as its application of the "mere inconvenience" test articulated in *Allison*, 481 Mich at 430, unless or until *Allison* is overruled. The majority's decision creates a new standard of interpreting Michigan's premises-liability jurisprudence and creates confusion about which standard ought to apply in future premises-liability cases.

# OPINION

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED July 20, 2026

STATE OF MICHIGAN

SUPREME COURT

JAN BOWERMAN,

      Plaintiff-Appellant,

v                                   No. 167718

RED OAK MANAGEMENT CO., INC., and
WESTVELD SERVICES, LLC,

      Defendants-Appellees,

and

BOB'S ASPHALT & PAVING, INC.,

      Defendant.

BEFORE THE ENTIRE BENCH

HOOD, J.

      This case is about the common-law duties and statutory covenants applicable to residential common areas. Plaintiff, Jan Bowerman, sustained an injury when she stepped

into a shallow trench near the trash-disposal area in the parking lot of the Stanton Park Apartments, where she then resided. Defendant Red Oak Management Co., Inc., managed the Stanton Park Apartments and contracted with defendant Westveld Services, LLC, to replace the existing concrete in certain areas around the apartment building. Westveld personnel created the trench when replacing the concrete slab underneath the Stanton Park Apartments' dumpster.

Two issues are presently before this Court. The first is whether there exists a genuine issue of material fact as to whether Westveld breached a duty it owed to Bowerman. The second is whether there exists a genuine issue of material fact as to whether Red Oak violated MCL 554.139(1)(a) (codifying the lessors' covenant that all common areas in leased residential premises will be fit for the use intended by the parties). On both questions, the Court of Appeals concluded that there is no genuine issue of material fact and affirmed the order granting summary disposition in favor of Red Oak and Westveld under MCR 2.116(C)(10).

We disagree with the Court of Appeals. There are genuine issues of material fact as to whether Westveld breached the common-law duty it owed to Bowerman and whether Red Oak breached its covenant under MCL 554.139(1)(a). We, therefore, reverse the Court of Appeals' decision and remand this case to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND

This case started with Bowerman fracturing her ankle in her apartment's parking lot. Around 7:15 a.m. on October 30, 2021, Bowerman stepped into a shallow trench

2

abutting the trash-disposal area in the parking lot of the Stanton Park Apartments, an apartment building for elderly and disabled individuals where she resided, and fractured her ankle. Red Oak had contracted with Westveld to replace existing concrete in certain areas around the building, and Westveld personnel created the trench at issue when they replaced the concrete platform underneath a dumpster. The trench, which measured approximately 10 feet in length and four inches in depth, spanned one edge of the newly poured concrete platform.

Different parties were responsible for making the trench, filling the trench, and generally maintaining the property. Eric Koch, a licensed general contractor whom Red Oak employed as a construction specialist, testified during his deposition that the trench remained uncovered and unmarked for several weeks after Westveld personnel completed their work and departed the Stanton Park Apartments on October 21, 2021. Red Oak had also contracted with defendant Bob's Asphalt & Paving, Inc., to fill the areas around the newly poured concrete with asphalt. It was not until November 10, 2021, that Bob's Asphalt personnel filled the trench. Westveld's owner, Randy Westveld, testified during his deposition that Westveld personnel typically marked conditions like the trench with cones or caution tape, but he could not specifically recall whether they did so before leaving the Stanton Park Apartments. He also acknowledged that the trench could pose a tripping hazard. And although Westveld personnel filled another smaller trench with sand so that a wheelchair-bound tenant could access the apartment building, they did not fill the trench at issue. Albertas Kerelis, a licensed architect and proposed property-management expert, testified during his deposition that he inspected the Stanton Park Apartments' parking lot where the trash-disposal area was located after dark and concluded that it was underlit

3

according to standards promulgated by the Illuminating Engineering Society of North America (IES).[1] Kerelis acknowledged, however, that he was not aware of any local ordinance or Michigan law that required residential premises to comply with IES standards.

Bowerman was 75 years old when she stepped in the trench. She had lived at the Stanton Park Apartments for several years. And Red Oak had previously employed her as the site manager for the apartment building before her retirement. Bowerman kept personal notes regarding the condition of the Stanton Park Apartments even after she retired. Prior to her injury, Bowerman noted Westveld's concrete replacement work and the location of the dumpster, which Westveld personnel had temporarily removed from the original concrete platform and placed in a nearby grassy area.

During her deposition, Bowerman testified that she fractured her ankle while attempting to take trash to the dumpster shortly before sunrise. She knew the location of the newly poured concrete platform, the trench, and the dumpster but could not clearly see the area in the early morning light. To avoid crossing the concrete platform on her way to the dumpster, Bowerman left the sidewalk and walked in a semicircle through the parking lot. She described the incident as follows:

> I looked out the side door, and I noticed that I could see the sidewalk. It was still dark, but there was still light on the sidewalk. I went down the sidewalk, and when I—I knew I was going to have to go to the parking lot to miss some of the area, but—so I went out to the parking lot. And once I got in the middle of the parking lot, it was all black. I couldn't see, so then I spotted the dumpster. They had moved it off the patio slab it was on. I—I seen that

---

[1] Using a specialized tool, Kerelis concluded that 0.0 foot-candles reached the parking lot surface. That figure, according to Kerelis, fell below the IES minimum standard for asphalt parking lots: 0.5 foot-candles.

4

because it had like a reflector on it, and there was a little light coming from the trees from the streetlight. So I kept my eye on that dumpster, and I started walking toward it. And before—before I knew it, my foot went right to the edge. At that time, I didn't know what it was, but it went right to the edge of that trash, and I fell right down—right down in the hole.

Following the fall, paramedics took Bowerman to a hospital by ambulance, and she was treated for a fractured ankle. Photographs allegedly taken minutes after Bowerman's fall depicted the trench as both uncovered and unmarked.

Bowerman later filed a three-count complaint against Red Oak, Westveld, and Bob's Asphalt. In Count I, Bowerman alleged that Red Oak breached its covenant under MCL 554.139(1) to keep the premises and all common areas fit for the use intended by the parties and in a reasonable state of repair. In Count II, Bowerman alleged that Westveld negligently failed to correct the trench or install adequate safeguards and warnings so as to negate the tripping hazard it posed. And in Count III, Bowerman similarly alleged that Bob's Asphalt negligently failed to correct the trench or install adequate safeguards and warnings to mitigate the tripping hazard it posed.

Red Oak, Westveld, and Bob's Asphalt each successfully moved for summary disposition under MCR 2.116(C)(10).[2] The trial court held, as a matter of law, that Red Oak did not breach its covenant under MCL 554.139(1)(a) because the trash-disposal area

---

[2] Bowerman does not challenge the trial court's order granting summary disposition in favor of Bob's Asphalt. Although the trial court did not explain its reasoning in a written order, Bob's Asphalt argued in its motion that its personnel did not create the trench and were unaware of its existence until they were asked to fill it on November 10, 2021. That argument was supported by an affidavit executed by Michael Radford, the co-owner of Bob's Asphalt, who stated that Koch requested on November 10, 2021, that Bob's Asphalt personnel fill the trench at issue. The material statements in the affidavit were uncontroverted.

5

remained reasonably accessible and was therefore fit for the use intended by the parties. The trial court further held that Bowerman's claim against Westveld sounded in premises liability and, as a matter of law, Westveld did not owe Bowerman any duty of care because the trench was an open and obvious hazard that lacked special aspects rendering it unreasonably dangerous.[3]

Bowerman appealed, and the Court of Appeals affirmed in a split, unpublished per curiam opinion. *Bowerman v Red Oak Mgt Co, Inc*, unpublished per curiam opinion of the Court of Appeals, issued September 12, 2024 (Docket No. 366338). The majority held, as a matter of law, that Red Oak did not breach its covenant under MCL 554.139(1)(a) to keep the common areas fit for the use intended by the parties because tenants retained reasonable access to the trash-disposal area, notwithstanding the presence of the trench. *Id*. at 4-5. Namely, the tenants had means of access to the trash-disposal area that did not require them to encounter the trench. *Id*. at 5. And because Bowerman was able to successfully walk around the trench on several other occasions, the majority characterized it as a "mere inconvenience" that did not negate the area's fitness for the use intended by the parties. *Id*.

The majority further held that Bowerman's claim against Westveld sounded in negligence rather than premises liability, such that Westveld had a duty to perform its work with ordinary care so as not to create an unreasonable risk of harm. *Id*. at 7. The majority concluded, as a matter of law, that Westveld did not breach its common-law duty. *Id*. It

---

[3] The trial court entered its summary-disposition order just months before this Court held in *Kandil-Elsayed v F & E Oil, Inc*, 512 Mich 95; 1 NW3d 44 (2023), that the open and obvious nature of a condition on a premises is relevant to breach and the parties' comparative fault rather than a land possessor's duty.

reasoned that the newly poured concrete platform was visible even in darkness. *Id*. And although Bowerman was aware of the trench's location and could have avoided it, she chose the path that led to her injury. *Id*.

Judge MARIANI dissented. In his view, summary disposition was unwarranted because there exist genuine issues of material fact regarding whether Red Oak breached its covenant under MCL 554.139(1)(a) and whether Westveld breached its common-law duty to perform its work with ordinary care so as not to create an unreasonable risk of harm. *Bowerman* (MARIANI, J., dissenting), unpub op at 1.

Bowerman sought leave to appeal before this Court, and we ordered oral argument on the application. We directed the parties to file supplemental briefs addressing whether genuine issues of material fact exist regarding whether Westveld breached any duty owed to Bowerman and whether Red Oak violated MCL 554.139(1)(a). *Bowerman v Red Oak Mgt Co, Inc*, ___ Mich ___; 21 NW3d 186 (2025).

## II. STANDARDS OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "A motion under MCR 2.116(C)(10) tests the factual sufficiency of a complaint." *Kandil-Elsayed v F & E Oil, Inc*, 512 Mich 95, 109; 1 NW3d 44 (2023) (quotation marks and citation omitted). "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *El-Khalil*, 504 Mich at 160. "A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact." *Id*. "A genuine issue of material

7

fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted). At bottom, "[a] court's role at the summary disposition stage is narrow[.]" *Kandil-Elsayed*, 512 Mich at 109.

We likewise review de novo matters of statutory interpretation. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 424; 751 NW2d 8 (2008). "The primary goal of statutory interpretation is to ascertain the legislative intent that may reasonably be inferred from the statutory language." *American Civil Liberties Union of Mich v Calhoun Co Sheriff's Office*, 509 Mich 1, 8; 983 NW2d 300 (2022) (quotation marks and citation omitted). "When statutory language is unambiguous, no further judicial construction is required or permitted because the Legislature is presumed to have intended the meaning it plainly expressed by the words it chose." *Id*.

## III. LAW AND ANALYSIS

### A. NEGLIGENCE

We begin with Bowerman's negligence claim against Westveld. Viewing the evidence in the light most favorable to Bowerman, reasonable persons could conclude that Westveld personnel created an unreasonable risk of harm by digging the trench and leaving it uncovered and unmarked upon their departure from the Stanton Park Apartments. It follows, then, that there exists a genuine issue of material fact regarding Westveld's breach of its common-law duty to refrain from unreasonably endangering others.

Michigan law distinguishes between claims based upon theories of ordinary negligence and those based upon premises liability. See, e.g., *Jeffrey-Moise v Williamsburg Towne Houses Coop, Inc*, 336 Mich App 616, 624-626; 971 NW2d 716 (2021). To identify the true nature of a claim, we must read the complaint as a whole and

8

look beyond procedural labels. See *Altobelli v Hartmann*, 499 Mich 284, 299; 884 NW2d 537 (2016). Premises-liability claims arise from the condition of the land at issue, see *Jeffrey-Moise*, 336 Mich App at 625, and they are predicated upon the defendant's possession and control of such land, see *Kubczak v Chem Bank & Trust Co*, 456 Mich 653, 660; 575 NW2d 745 (1998). A plaintiff, therefore, may assert a premises-liability claim only against a defendant with possession and control over the land at issue at the time the plaintiff's injury occurred. See *id*. Ordinary negligence claims, on the other hand, are "based on the underlying premise that a person has a duty to conform [their] conduct to an applicable standard of care when undertaking an activity." *Jeffrey-Moise*, 336 Mich App at 624.

The Court of Appeals majority correctly held that Bowerman's claim against Westveld sounds in ordinary negligence rather than premises liability. The record reflects that Westveld personnel completed their work and departed the Stanton Park Apartments on October 21, 2021. Westveld lacked possession and control of the trash-disposal area when Bowerman's injury occurred on October 30, 2021. Bowerman's claim is correspondingly premised upon the alleged failure of Westveld's personnel to conform their conduct to the applicable standard of care associated with replacing the concrete platform underneath the dumpster. Such a claim sounds in ordinary negligence rather than premises liability. See *Kubczak*, 456 Mich at 660; *Jeffrey-Moise*, 336 Mich App at 625.[4]

---

[4] Justice BOLDEN views the issue through an alternative lens in her dissent. She concludes that Bowerman's claim sounds in premises liability alone because her alleged injury was caused by a condition on the land. But this issue does not hinge solely on the condition that caused Bowerman's alleged injury. It also concerns the alleged failure of Westveld's personnel to conform their conduct to the applicable standard of care. See *Laier v Kitchen*,

Ordinary negligence has four essential parts: (1) duty, (2) breach, (3) causation, and (4) damages. See *Hill v Sears, Roebuck & Co*, 492 Mich 651, 660; 822 NW2d 190 (2012). "[T]he threshold question in a negligence action is whether the defendant owed a duty to the plaintiff." *Id*. at 660 n 19. "Duty is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person." *Moning v Alfono*, 400 Mich 425, 438-439; 254 NW2d 759 (1977) (citations omitted). The common law "imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern [their] actions as not to unreasonably endanger the person or property of others." *Clark v Dalman*, 379 Mich 251, 261; 150 NW2d 755 (1967). "Generally, unless the court can conclude that *all* reasonable persons would agree the defendant did not create an unreasonable risk of harm, whether a defendant's conduct in the particular case breached this general standard of care is a question of fact for the jury to decide." *Finazzo v Fire Equip Co*, 323 Mich App 620, 634; 918 NW2d 200 (2018) (emphasis added).

---

266 Mich App 482, 493; 702 NW2d 199 (2005) (opinion by NEFF, J.) ("Defendant's *conduct* was . . . an alleged basis of liability, independent of premises liability."); cf. *Boylan v Fifty Eight, Ltd Liability Co*, 289 Mich App 709, 721; 808 NW2d 277 (2010) ("[A] party to a contract breaches a duty separate and distinct from the contract when it creates a new hazard that it should have anticipated would pose a dangerous condition to third persons."). Looking at the substance of the complaint, Bowerman alleges that Westveld breached its duties to correct the trench *and* install adequate safeguards or warnings so that it would not constitute a tripping hazard. Because Bowerman does more than merely allege that Westveld personnel created a condition on the land—i.e., she alleges that Westveld personnel breached their "obligation to use due care, or to so govern [their] actions as not to unreasonably endanger the person or property of others," *Clark v Dalman*, 379 Mich 251, 261; 150 NW2d 755 (1967)—we conclude that Bowerman's claim against Westveld sounds in ordinary negligence rather than premises liability.

10

The Court of Appeals majority erred by holding that there exists no genuine issue of material fact regarding Westveld's breach of its common-law duty to refrain from unreasonably endangering others. The record reflects that Westveld personnel created the trench when they replaced the concrete platform underneath the Stanton Park Apartments' dumpster. When they finished their work, Westveld personnel left the site. But they also left the trench at issue uncovered and unmarked, which is how it remained for several weeks. According to Westveld's owner, who acknowledged that the trench could pose a tripping hazard, Westveld personnel typically marked conditions such as the trench with cones or caution tape, but he could not specifically recall whether they did so in anticipation of departing the Stanton Park Apartments. And although Westveld personnel filled another smaller trench with sand so that a wheelchair-bound tenant could access the apartment building—an act that could be construed as a tacit acknowledgment that such a condition posed an obstacle to the tenants—they did not fill the trench at issue. Viewing the evidence in the light most favorable to Bowerman, see *El-Khalil*, 504 Mich at 160, reasonable persons could conclude that Westveld personnel created an unreasonable risk of harm by digging the trench and leaving it uncovered and unmarked upon their departure from the Stanton Park Apartments. It follows, then, that there exists a genuine issue of material fact regarding Westveld's breach of its common-law duty to refrain from unreasonably endangering others. See *Finazzo*, 323 Mich App at 634.

In reaching the opposite conclusion, the Court of Appeals majority relied on evidence regarding Bowerman's own actions as well as her knowledge of the trench's existence and location. *Bowerman*, unpub op at 7. But as we explained in *Kandil-Elsayed*, "Michigan is a comparative-fault jurisdiction, meaning that it is the policy of our state that

when a plaintiff is at fault, it does *not* bar recovery, but rather reduces the amount of damages they can recover by their percentage of fault." *Kandil-Elsayed*, 512 Mich at 133, citing MCL 600.2959. Under Michigan's comparative-fault framework, "[i]n an action based on tort or another legal theory seeking damages for personal injury, . . . the liability of each person shall be allocated . . . by the trier of fact and . . . in direct proportion to the person's percentage of fault." MCL 600.2957(1). Bowerman's acts and omissions are relevant to her degree of comparative fault but do not establish, as a matter of law, that Westveld personnel acted in accordance with their common-law *duty* to refrain from unreasonably endangering others. The Court of Appeals majority thus erred by relying on evidence regarding Bowerman's acts and omissions as the basis for its conclusion that Westveld was entitled to summary disposition under MCR 2.116(C)(10).

## B. MCL 554.139

We likewise conclude that there is a genuine issue of material fact as to whether Red Oak breached its statutory covenant under MCL 554.139. MCL 554.139 provides, in part:

> (1) In every lease or license of residential premises, the lessor or licensor covenants:

> (a) That the premises and all common areas are fit for the use intended by the parties.

> (b) To keep the premises in reasonable repair during the term of the lease or license, and to comply with the applicable health and safety laws of the state and of the local unit of government where the premises are located, except when the disrepair or violation of the applicable health or safety laws has been caused by the tenant[']s wilful or irresponsible conduct or lack of conduct.

"MCL 554.139 provides a specific protection to lessees and licensees of residential property in addition to any protection provided by the common law." *Allison*, 481 Mich at 425 (emphasis omitted). "The statutory protection under MCL 554.139(1) arises from the existence of a residential lease and consequently becomes a statutorily mandated term of such lease." *Id*. The plain language of the statute further provides that MCL 554.139 "shall be liberally construed" in favor of lessees, who are entitled to "have the benefit of the covenants established [t]herein." MCL 554.139(3). Liberal construction requires a court to give the statutory text "the largest, the fullest, and most extensive meaning" of which it is susceptible. *Birznieks v Cooper*, 405 Mich 319, 331 n 12; 275 NW2d 221 (1979) (quotation marks and citation omitted).

The seminal case addressing these statutory covenants is *Allison v AEW Capital Mgt, LLP*—a different sort of parking-lot case. In *Allison*, 481 Mich at 427, we recognized that MCL 554.139 does not define the term "common areas," and we concluded that, "in the context of leased residential property, 'common areas' describes those areas of the property over which the lessor retains control that are shared by two or more, or all, of the tenants." Using that definition, we concluded that the parking lot within the leased residential property at issue was a common area such that the lessor had a statutory duty to keep it fit (i.e., adapted, suited, or appropriate) for the parking of vehicles. *Id*. at 429. To do so, at least in relation to the accumulation of snow and ice, the lessor was required "to ensure that the entrance to, and the exit from, the lot [was] clear, that vehicles [could] access parking spaces, and that tenants [had] reasonable access to their parked vehicles." *Id*. We elaborated that MCL 554.139(1)(a) "does not require a lessor to maintain a lot in an ideal condition or in the most accessible condition possible, but merely requires the

13

lessor to maintain it in a condition that renders it fit for use as a parking lot." *Allison*, 481 Mich at 430. And we stated that "[m]ere inconvenience of access . . . will not defeat the characterization of a lot as being fit for its intended purposes." *Id*. On these bases, we held, as a matter of law, that the one to two inches of accumulated snow and underlying layer of ice on which the plaintiff slipped and fell did not render the parking lot at issue unfit for the use intended by the parties. *Id*. at 423, 431. We reasoned as follows:

> In this case, in construing the meaning of these terms in the contract, neither of the parties has indicated that the intended use of the parking lot was anything other than basic parking and reasonable access to such parking. Plaintiff's allegation of unfitness was supported only by two facts: that the lot was covered with one to two inches of snow and that plaintiff fell. Under the facts presented in this record, we believe that there could not be reasonable differences of opinion regarding the fact that tenants were able to enter and exit the parking lot, to park their vehicles therein, and to access those vehicles. Accordingly, plaintiff has not established that tenants were unable to use the parking lot for its intended purpose, and his claim fails as a matter of law. [*Id*. at 429-430.]

Central to the *Allison* Court's analysis was fitness in the context of using a parking lot to park and to enter, exit, and access parked vehicles. *Id*. There was no discussion of the area's fitness for *other uses*, such as reaching a dumpster.

Here, the parties do not dispute that the Stanton Park Apartments' trash-disposal area was a "common area" as provided in MCL 554.139(1)(a). The record reflects that Red Oak retained control over the trash-disposal area and that each of the residents of the building had shared access to the area. Red Oak therefore had a statutory duty under MCL 554.139(1)(a) to keep the trash-disposal area fit for the use or uses intended by the parties. MCL 554.139(1)(a); *Allison*, 481 Mich at 429. Nor do the parties dispute that the Stanton Park Apartments held itself out as specifically housing elderly and disabled tenants. This

14

narrow category of tenants matters because MCL 554.139(1)(a) requires courts to analyze the fitness of a common area not in the abstract but rather in light of the uses intended by the parties to a residential lease. There is, in other words, a nexus between a common area's fitness and the particular tenants at issue. To comply with its statutory duty, then, Red Oak was required to ensure that elderly and disabled tenants had reasonable access to a means of disposing of their trash. See *Allison*, 481 Mich at 429.

In both viewing the evidence in the light most favorable to Bowerman, see *El-Khalil*, 504 Mich at 160, and liberally construing the statute, see MCL 554.139(3), there exists a genuine issue of material fact regarding whether Red Oak breached its covenant under MCL 554.139(1)(a). Again, Westveld personnel created the trench when they replaced the concrete platform underneath the dumpster. The trench was situated near the sidewalk leading from the apartment building and the newly poured concrete slab, on the opposite side of which sat the dumpster. Upon completing their work, Westveld personnel departed, leaving the trench uncovered and unmarked for several weeks. Red Oak personnel did not install warnings or visual aids before Bowerman was injured, and the co-owner of Bob's Asphalt attested in an affidavit that Red Oak's construction specialist did not request that the trench be filled until after Bowerman's injury occurred. Moreover, Kerelis, a licensed architect and Bowerman's proposed property-management expert, opined that the parking lot where the trash-disposal area was located was underlit. This evidence, paired with photographs of the area, supported Bowerman's testimony characterizing the trench as difficult to see in the predawn hours. On these facts, reasonable

15

persons could conclude that the trench posed a hazard to the elderly and disabled tenants sufficient to render the trash-disposal area unfit for the use intended by the parties.[5]

In reaching a contrary conclusion, the Court of Appeals majority characterized the trench as posing a "mere inconvenience" of access that did not negate the area's fitness for the use intended by the parties because Bowerman was able to successfully walk around it to access the dumpster on several prior occasions. *Bowerman*, unpub op at 5. Since *Allison*, 481 Mich at 430 (noting that "[m]ere inconvenience of access . . . will not defeat the characterization of a lot as being fit for its intended purposes"), many of our courts have engaged in similar analyses. See, e.g., *Bowman v Walker*, 340 Mich App 420, 433; 986 NW2d 419 (2022) ("Even viewing the evidence in the light most favorable to plaintiffs, they have only shown that the sidewalk had some ice and snow on it, which at most indicated that there was inconvenience of access or that the patio was not in peak

---

[5] In her partial dissent, Justice THOMAS opines that we conflate the inquiry regarding a common area's fitness for the use intended by the parties with the inquiry regarding whether a condition presents an unreasonable risk of harm under a common-law negligence theory. But that is not so. Consistent with our analysis, a single hazard may render a distinct common area unfit for the use intended by the parties but does not necessarily do so. And our conclusion that there exists a genuine issue of material fact as to whether Red Oak breached its covenant under MCL 554.139(1)(a) is informed by the Stanton Park Apartments being held out as specifically housing elderly and disabled tenants. The dissent further asserts that we blur the distinction between the covenant of fitness under MCL 554.139(1)(a) and the covenant of reasonable repair under MCL 554.139(1)(b). But again, that is not so. The covenant of reasonable repair does not apply to common areas, see *Allison*, 481 Mich at 432, and thus is not at issue. We need not address the distinction between the two covenants to conclude that there exists a genuine issue of material fact as to whether Red Oak breached the covenant of fitness. To the extent that repairs are relevant to the issue presented, "[t]he exclusion of common areas from the covenant to repair imposed by the statute does not necessarily mean that the lessor is free of any duty to repair common areas, because these areas must still be kept 'fit for the use intended by the parties.' " *Id*. at 433.

16

condition."); *Estate of Trueblood v P&G Apartments, LLC*, 327 Mich App 275, 291; 933 NW2d 732 (2019) ("We conclude that a sidewalk completely covered in ice is not fit for its intended use . . . because it does not present a '[m]ere inconvenience of access . . . .' "), quoting *Allison*, 481 Mich at 430; *Hadden v McDermitt Apartments, LLC*, 287 Mich App 124, 132; 782 NW2d 800 (2010) ("This case is factually distinguishable from *Allison* because black ice on a stairway presents more than the '[m]ere inconvenience' posed by 'one to two inches of snow' in a parking lot."), quoting *Allison*, 481 Mich at 423, 430. These cases gradually—and improperly—shifted the focus from "fit[ness] for the use intended by the parties," MCL 554.139(1)(a), to the degree of unfitness—with "[m]ere inconvenience of access," *Allison*, 481 Mich at 430, becoming a trapdoor in the analysis.[6]

We clarify today that the value of such an inquiry (i.e., whether the degree of unfitness is merely inconvenient) is limited, especially in this context, where it relates to residences that specifically house elderly or disabled tenants.[7] The extent to which a hazard

---

[6] Our analysis differs from that expressed in Justice BOLDEN's dissent. We decline to read an exception (that mere inconvenience of access will not defeat the characterization of a lot as being fit for its intended purpose) as the rule (that in every lease of residential premises, the lessor covenants that all common areas are fit for the use intended by the parties). In other words, the controlling test set forth by *Allison* (and, more importantly, the statute) is not "[m]ere inconvenience" but is rather whether the common area was fit for its intended purpose. *Allison*, 481 Mich at 430. We, therefore, do not overrule *Allison* or otherwise alter its ultimate holding.

[7] Justice BOLDEN also posits in her dissent that we fail to cite authority in support of the premise that a lessee's inclusion among a specific demographic that a lessor purports to accommodate may be relevant to the inquiry under MCL 554.139(1)(a). Yet the premise derives from the plain language of the statute itself, which provides that "[i]n every lease . . . of residential premises, the lessor . . . covenants . . . [t]hat the premises and all common areas are fit for the use *intended by the parties*." *Id*. (emphasis added). There are also several references in the trial court record to the Stanton Park Apartments' housing of elderly or disabled tenants, including an acknowledgment of such by Koch, the individual

17

poses an inconvenience of access may be relevant, but it is not dispositive.  See *Allison*,

481 Mich at 430.  Consistent with our explanation in *Allison*, the appropriate inquiry under

MCL 554.139(1)(a) remains whether the common area in question is *fit* (i.e., adapted,

suited, or appropriate) for the use intended by the parties.  See *id*.; MCL 554.139(1)(a).  If

a common area is fit for such use, a plaintiff may not prevail simply by identifying some

inconvenience of access they encountered.  Likewise, if a common area is unfit for such

use, a defendant may not prevail simply by labeling a hazardous condition as a mere

inconvenience.  Regardless, the starting point must always be the test set forth in the statute

and applied in *Allison*: whether the common area was "fit for the use intended by the

parties" under the circumstances of the specific case.  MCL 554.139(1)(a); *Allison*, 481

Mich at 429-430.  The Court of Appeals majority therefore erred by concluding, as a matter

of law, that Red Oak did not breach its covenant under MCL 554.139(1)(a).[8]

---

whom Red Oak employed as a construction specialist.  In fact, Bowerman's counsel
specifically raised the premise amid an exchange with the trial court while arguing in
opposition to summary disposition during the hearing regarding the motions filed by
Westveld and Red Oak.

[8] We decline to address Bowerman's contention that the Court of Appeals cited *Allison*,
481 Mich at 425-426, for the erroneous premise that "breach of the duty to maintain the
premises under MCL 554.139(1)(a) or (b) would be construed as a breach of the terms of
the lease between the parties and any remedy under the statute would consist exclusively
of a contract remedy."  See *Bowerman*, unpub op at 4.  Red Oak's summary-disposition
motion did not implicate the nature and extent of Bowerman's remedy, the matter was not
at issue before the Court of Appeals, and we did not grant oral argument on the application
with respect to that issue.  The parties, however, remain free to raise the issue on remand.

## IV.  CONCLUSION

The Court of Appeals erred by affirming the trial court's order granting summary disposition in favor of Westveld and Red Oak.  Contrary to the Court of Appeals' decision, there exist genuine issues of material fact as to whether Westveld breached the common-law duty it owed to Bowerman and whether Red Oak breached its covenant under MCL 554.139(1)(a).  We therefore reverse the Court of Appeals' decision and remand this case to the trial court for further proceedings consistent with this opinion.

Noah P. Hood
Megan K. Cavanagh
Richard H. Bernstein
Elizabeth M. Welch
Kimberly A. Thomas (as to Part III(A))

STATE OF MICHIGAN

SUPREME COURT

JAN BOWERMAN,

        Plaintiff-Appellant,

v                                          No. 167718

RED OAK MANAGEMENT CO., INC., and
WESTVELD SERVICES, LLC,

        Defendants-Appellees,

and

BOB'S ASPHALT & PAVING, INC.,

        Defendant.

_____

THOMAS, J. (*concurring in part and dissenting in part*).

I agree with the majority that genuine issues of material fact exist as to plaintiff Jan

Bowerman's negligence claim against Westveld Services, LLC (Westveld), and I concur

in full with Part III(A) of the majority opinion.[1]  However, I disagree with the majority that

genuine issues of material fact exist as to whether defendant Red Oak Management Co.,

---

[1] I note that the only issue raised in this appeal is whether genuine issues of material fact exist as to breach of a duty owed.  Where, as here, an injured party brings an ordinary negligence claim against a contractor for an injury sustained after the contractor completed work on a project, questions may also arise as to causation and as to allocation of responsibility for any damages owed with the premises possessor.  See *Ray v Swager*, 501 Mich 52, 63-64; 903 NW2d 366 (2017) (noting that a plaintiff must show factual and legal causation to sustain a negligence action); MCL 600.2957(1) ("In assessing percentages of fault under this subsection, the trier of fact shall consider the fault of each person, regardless of whether the person is, or could have been, named as a party to the action.").

Inc. (Red Oak) breached its covenant under MCL 554.139(1)(a) to ensure that "all common areas are fit for the use intended by the parties," so I respectfully dissent from Part III(B) of the majority opinion.

I agree with the majority that the condition at issue—a shallow trench in front of a concrete platform in the parking lot upon which a dumpster was to be placed—was in a "common area" subject to the statutory covenant of fitness in MCL 554.139(1)(a). I also agree that compliance with this covenant required Red Oak to ensure that the area was "fit" for tenants to access the dumpster to throw away their trash. Finally, I agree with the majority that many lower court decisions have overly relied on the "[m]ere inconvenience" language from *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 430; 751 NW2d 8 (2008), at the expense of the statute's text.[2]

Where I depart from the majority is in how to assess what is sufficient to create a genuine issue of material fact regarding a common area's "*fit*[ness] for the use intended by the parties." MCL 554.139(1)(a) (emphasis added). The majority appears to view this inquiry as functionally equivalent to whether a condition creates an "unreasonable risk of harm" for purposes of a common-law negligence claim.[3] *Kandil-Elsayed v F & E Oil, Inc*,

---

[2] Because it does not affect my conclusion in this case, I take no position on the majority's contention that a court should assess fitness under MCL 554.139(1)(a) in relation to the characteristics of a property's particular tenants. In other words, I don't think there is a genuine issue of material fact as to lack of fitness in this case even assuming the majority is correct that the question is whether the area was "fit" for use specifically by tenants who are elderly or have disabilities.

[3] Importantly, plaintiff did not plead any common-law claims against Red Oak, instead relying solely on alleged breaches of the statutory covenants in MCL 554.139. Red Oak's supplemental brief in this Court essentially concedes that, had plaintiff pled a premises

512 Mich 95, 112; 1 NW3d 44 (2023) (citation modified); see also *Clark v Dalman*, 379 Mich 251, 261; 150 NW2d 755 (1967) (describing a contractor's common-law duty to not "unreasonably endanger" others). In my view, these are distinct legal questions. While the common law places a duty as to *any* condition on land that creates an unreasonable risk of harm, the statutory covenant of fitness relates to the area as a whole, i.e., whether "*the premises and all common areas* are fit for the use intended by the parties." MCL 554.139(1)(a) (emphasis added). This requires a focus on the fitness of the premises or common areas more broadly and not simply whether there is *any* unreasonable risk of harm on the property.[4]

The majority's reading also blurs the distinction between the covenant of reasonable repair, which is a protection for tenants' units and other non-common areas on the property,[5] and the covenant of fitness, which applies to the entire property. See MCL

---

liability claim, summary disposition in its favor under MCR 2.116(C)(10) would have been inappropriate as to that claim.

[4] While this Court has stated that "MCL 554.139 provides a specific protection to lessees and licensees of residential property in *addition* to any protection provided by the common law," *Allison*, 481 Mich at 425, it did so in the context of explaining why the then-recognized "open and obvious danger" doctrine did not per se preclude a claim under MCL 554.139. This Court has not addressed the covenant of fitness since this Court overruled *Lugo v Ameritech Corp, Inc*, 464 Mich 512; 629 NW2d 384 (2001), and held that the open and obvious nature of a condition pertains only to breach and not to duty. See generally *Kandil-Elsayed*, 512 Mich 95. That a statutory claim under MCL 554.139 is distinct from a common-law claim does not necessarily mean that it provides greater protection than the common law in every respect, although it might in some. See *McNeal v Lincolnshire 2007 Ltd Dividend Housing Ass'n, LLC*, ___ Mich App ___, ___; ___ NW3d ___ (October 23, 2025) (Docket No. 370549); slip op at 2-4 (holding that there is no notice requirement for a claim alleging a violation of MCL 554.139).

[5] The covenant of reasonable repair requires a lessor "[t]o keep the premises in reasonable repair during the term of the lease or license, and to comply with the applicable health and

3

554.139(1)(a) (fitness); MCL 554.139(1)(b) (reasonable repair); *Allison*, 481 Mich at 432. While "[t]he exclusion of common areas from the covenant to repair . . . does not necessarily mean that the lessor is free of any duty to repair common areas," the repairs necessary to satisfy the covenant of fitness "may conceivably require repairs less extensive than those required by the second covenant." *Allison*, 481 Mich at 433. The majority's analysis—which relies on Red Oak's failure to remediate the risks posed by the trench and on expert testimony opining that the lighting in the parking lot where the trash-disposal area was located did not satisfy industry standards—appears to de facto subject common areas to *both* covenants.[6]

In this case, I agree with the majority that a reasonable jury could conclude that the trench created an unreasonable danger such that Westveld breached a common-law ordinary negligence duty. However, I would conclude that no reasonable jury could find that the trench rendered the common area unfit under MCL 554.139(1)(a). While the trench was approximately 10 feet long, it was not very wide (less than a foot),[7] and tenants could easily avoid it when throwing away their trash or when walking through the parking lot to access a vehicle. I do not mean to suggest that the *entire* common area must be unfit to violate MCL 554.139(1)(a). And there will be circumstances where the determination of

___

safety laws of the state and of the local unit of government where the premises are located . . . ." MCL 554.139(1)(b).

[6] While plaintiff's complaint alleged that Red Oak also violated MCL 554.139(1)(b), this Court only directed the parties to address MCL 554.139(1)(a), and the majority reverses the judgment of the Court of Appeals solely on plaintiff's claim under the covenant of fitness.

[7] While there appears to be no record evidence of a precise measurement of the trench's width, the above estimate is consistent with photographic evidence in the record.

4

whether a danger is sufficiently pervasive to constitute a breach of this covenant will be a jury question. See *Kandil-Elsayed*, 512 Mich at 109. But there is a minimum threshold before a jury is even presented with an issue, *id*. at 112 n 2, and I believe that claims under MCL 554.139(1)(a) focus on the fitness of an area more broadly than a common-law negligence claim does.

In sum, while I agree with the majority as to plaintiff's common-law negligence claim against Westveld, I believe that the majority's analysis of plaintiff's statutory claim against Red Oak wrongly conflates the covenant of fitness in MCL 554.139(1)(a) with a common-law negligence duty and with the covenant of reasonable repair in MCL 554.139(1)(b). Viewing the trench here within the context of the common area more broadly, I agree with the lower courts that no genuine issues of material fact exist as to a breach of the covenant of fitness in MCL 554.139(1)(a). I therefore respectfully dissent in part.

Kimberly A. Thomas

JAN BOWERMAN,

      Plaintiff-Appellant,

v                                        No. 167718

RED OAK MANAGEMENT CO., INC., and
WESTVELD SERVICES, LLC,

      Defendants-Appellees,

and

BOB'S ASPHALT & PAVING, INC.,

      Defendant.

---

BOLDEN, J. (*dissenting*).

In my view, the majority's decision creates a new standard of interpreting our premises-liability jurisprudence and creates confusion about which standard ought to apply in future premises-liability cases. I would have affirmed the judgment of the Court of Appeals, which applied our longstanding doctrines. Therefore, I respectfully dissent.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

Plaintiff has lived at Stanton Park Apartments (Stanton Park), an apartment complex managed by defendant Red Oak Management Company, Inc. (Red Oak), for several years. In October 2021, Red Oak hired defendant Westveld Services, LLC (Westveld) to replace a concrete slab that sat underneath a dumpster on the southern end of Stanton Park's parking lot.

Westveld began its work on October 14, 2021. Westveld moved the dumpster to a grassy area on the south edge of the parking lot to perform its concrete work. When the concrete was laid and dried, the dumpster was returned from the grassy area to the concrete slab. Without dispute, Westveld's concrete work left a gap or trench between Stanton Park's parking lot and the new concrete slab. The trench extended the length of the slab. Plaintiff claims that the dimensions of the trench were about four to five inches deep and several feet long. Photographs of the trench show that an alternative pathway to the dumpster was made with a concrete sidewalk.

Westveld claims that its plan was for the trench to be filled in by Bob's Asphalt & Paving, Inc., and that Bob's Asphalt would usually fill trenches within a day or two of the completion of the project. However, on this occasion, Bob's Asphalt was delayed.[1] Westveld finished its work on October 21, 2021, at which point the trench had not been filled. Bob's Asphalt filled the trench with asphalt on November 10, 2021.

Prior to these events, plaintiff had been a site manager for Red Oak for nearly 20 years before her retirement; about half of that time was spent as a manager at Stanton Park. She retired from her role at Red Oak in 2018, but she continued to keep detailed personal notes about the conditions around the Stanton Park premises as a resident. Her notes continued during the time spanning this construction project. On October 14, 2021, plaintiff noted, "Dumpster was moved to grass area." She further noted that "[s]idewalks were being teared [sic] out. Started to rain. The company left cement and trash left laying

---

[1] The manager of Red Oak also testified in a deposition that Bob's Asphalt would normally fill in the trench sooner than it did.

2

on parking lot areas. No signs—caution tapes—no cones was [sic] put out. From the 14th of afternoon to 10-17-21 nothing was done on sidewalks." On October 18, 2021, plaintiff noted that "[s]idewalk repairs started up again."

On the morning of October 30, 2021, at around 7:30 a.m., plaintiff fell taking her trash to the dumpster. She was 75 years old at the time of her fall. Plaintiff noted: "I fell into trench took my trash out at 7:30 a.m. was dark. Called ambulance (my brother called)." Plaintiff testified that she had taken her trash out every day during this period. She testified about the following memory of the morning she fell:

> So my brother came over as he normally does, and we had our morning coffee. And he left about an hour later to his apartment, and I wanted to get that trash out. So as soon as he left, I put my shoes on, got my trash ready. I went out my apartment, turned to the left, went about 80 feet to that side door. And that side door, there's a handicapped sidewalk. I walked down to the end of the sidewalk. And then about—once you get past that sidewalk, it's about eight feet or ten feet, and I'm at the dumpster, and that's the route I always use to take out my trash.

> Well, that particular morning, I didn't wait. I looked out the side door, and I noticed that I could see the sidewalk. It was still dark, but there was still light on the sidewalk. I went down the sidewalk, and when I—I knew I was going to have to go to the parking lot to miss some of the area, but—so I went out to the parking lot. And once I got in the middle of the parking lot, it was all black. I couldn't see, so then I spotted the dumpster. They had moved it off the patio slab it was on. I—I seen that because it had like a reflector on it, and there was a little light coming from the trees from the streetlight. So I kept my eye on that dumpster, and I started walking toward it. And before—before I knew it, my foot went right to the edge. At that time, I didn't know what it was, but it went right to the edge of that trash, and I fell right down—right down in the hole.

Plaintiff continued to testify that her plan was to avoid walking toward the concrete slab because she thought the cement might be wet and she knew there were trenches there.[2] So, she claimed, when she could see a reflective light coming from a streetlight that was shining through some bushes, she knew the reflection was coming from the dumpster and walked toward it. She ended up falling and getting her foot stuck in the trench. She sustained injuries to the three main bones in her ankle, which required trauma care and eventual surgery.

Plaintiff filed this lawsuit. Pertinent to this appeal, plaintiff sued Westveld in ordinary negligence and Red Oak in premises liability.[3] Westveld and Red Oak each moved for summary disposition. The trial court granted Westveld's motion for summary disposition because the trench was an open and obvious condition and also granted Red Oak's motion because the parking lot was fit for its intended use.

Plaintiff appealed both grants of summary disposition. The Court of Appeals affirmed. *Bowerman v Red Oak Mgt Co, Inc*, unpublished per curiam opinion of the Court of Appeals, issued September 12, 2024 (Docket No. 366338). Judge MARIANI dissented. We now decide whether the Court of Appeals erred.

---

[2] Plaintiff referred to multiple trenches in her deposition testimony. Regardless of whether one trench or multiple trenches existed at the time of her fall, this opinion addresses only the trench where she fell.

[3] Plaintiff also named Bob's Asphalt in her complaint; however, Bob's Asphalt has since been dismissed from the lawsuit. Accordingly, only Westveld and Red Oak are addressed in my dissent.

## II. ANALYSIS

This appeal stems from two independent motions for summary disposition filed by two separate defendants seeking dismissal of claims filed under two separate tort theories. We review grants and denials of summary disposition de novo. *Ray v Swager*, 501 Mich 52, 61-62; 903 NW2d 366 (2017). De novo review means that we review the legal issue independently without deferring to the lower courts. *Genesee Co Drain Comm'r v Genesee Co*, 504 Mich 410, 417; 934 NW2d 805 (2019).

The majority first addresses whether Westveld, the contractor, could be held liable under a theory of ordinary negligence; it holds that a genuine issue of material fact supports plaintiff's claims and that the Court of Appeals erred by holding otherwise. I disagree because plaintiff's claim against Westveld sounds in premises liability, and thus, the lower courts reached the correct disposition, but for the wrong reasons.

Next, the majority addresses whether Red Oak, the property manager, could be held liable under a premises-liability theory; it holds that here, too, there's a genuine issue of material fact and that the Court of Appeals erred by holding otherwise. Justice THOMAS disagrees because she believes that the majority conflates the distinction between the statutory covenant of fitness and the common-law duty of negligence. I also disagree, but for different reasons. Since the "[m]ere inconvenience of access . . . will not defeat the characterization of a lot as being fit for its intended purposes," summary disposition was appropriately granted. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 430; 751 NW2d 8 (2008).

5

## A. WHETHER WESTVELD CAN BE HELD LIABLE IS A QUESTION THAT SHOULD LIE IN PREMISES LIABILITY

Although plaintiff sued Westveld, the contractor that Red Oak hired to pour concrete and renovate the terrain on which the dumpster sat, in ordinary negligence, the parties dispute whether the complaint sounds in premises liability or ordinary negligence.

The applicability of the proper legal doctrine is reviewed de novo. *Ghaffari v Turner Constr Co*, 473 Mich 16, 19; 699 NW2d 687 (2005). When determining whether the complaint lies in ordinary negligence or premises liability—the gravamen of the action—we must look beyond procedural labels and consider the entirety of the plaintiff's complaint. See *Maiden v Rozwood*, 461 Mich 109, 135; 597 NW2d 817 (1999) (holding that a plaintiff cannot avoid the protection of witness immunity by artful pleading and that we must look to the whole complaint); *Altobelli v Hartmann*, 499 Mich 284, 299-300; 884 NW2d 537 (2016) (looking beyond procedural labels to determine whether the plaintiff's action fell within the scope of an arbitration clause); *Scola v JPMorgan Chase Bank*, 506 Mich 924, 924 (2020) (reading the whole complaint and not merely its labels when deciding whether a claim sounded in ordinary negligence or premises liability). When a plaintiff claims that they were injured by a condition of the land, their claim sounds in premises liability. *James v Alberts*, 464 Mich 12, 18-19; 626 NW2d 158 (2001); see also *Kachudas v Invaders Self Auto Wash*, 486 Mich 913, 914 (2010) ("Although an injured person may pursue a claim in ordinary negligence for the overt acts of a premises owner on his or her premises, the plaintiff in this case is alleging injury by a condition of the land, and as such, his claim sounds exclusively in premises liability.") (citation omitted). " '[P]remises liability is conditioned upon the presence of both possession and control over

6

the land.' " *Kubczak v Chem Bank & Trust Co*, 456 Mich 653, 660; 575 NW2d 745 (1998), quoting *Merritt v Nickelson*, 407 Mich 544, 552; 287 NW2d 178 (1980); *Orel v Uni-Rak Sales Co, Inc*, 454 Mich 564; 563 NW2d 241 (1997). In contrast, general negligence stems from the activity or conduct of the defendant. See *James*, 464 Mich at 18-19. However, when a plaintiff's injury occurs because of a condition on a defendant's land, merely alleging that a defendant created the condition on the land does not transform what is otherwise a premises-liability action into one sounding in ordinary negligence. *Jahnke v Allen*, 308 Mich App 472, 476; 865 NW2d 49 (2014). Thus, we turn to plaintiff's complaint to determine whether her allegations properly sound in ordinary negligence.

Plaintiff alleges that she fell in the trench in between the concrete slab created by Westveld and Stanton Park's existing parking lot on October 30, 2021. As the majority correctly asserts, the record reflects that Westveld had completed its work and departed Stanton Park nine days before plaintiff's fall. The majority concludes, then, that Westveld lacked possession and control at the time of the injury, so plaintiff's injury was premised on Westveld's failure to conform its conduct to the applicable standard of care when replacing the concrete platform, which sounds in ordinary negligence. Although I agree with the majority that Westveld lacked possession and control, I disagree that this alone means that plaintiff has alleged a claim of ordinary negligence.

The crux of this analysis is whether plaintiff was injured by a condition of the land, which requires us to examine how plaintiff alleges she was injured. Plaintiff alleges that her injuries were caused when her foot became lodged in the trench—the space in the ground between the newly renovated cement pad and Stanton Park's parking lot—nine

7

days after Westveld's work at Stanton Park was complete. Plaintiff clearly complains about a condition on the land. She complains that a 10-foot-long trench between the cement pad and the Stanton Park parking lot was the source of her injury. She fell in the trench. This is a premises-liability claim. Affixing the label of ordinary negligence to a claim based on an injury caused by a condition of the land (like this one) does not transform the claim from a premises-liability claim into one sounding in ordinary negligence. *Kachudas*, 486 Mich at 914; *Jahnke*, 308 Mich App at 476.

"All negligence actions, including those based on premises liability, require a plaintiff to prove four essential elements: duty, breach, causation, and harm." *Kandil-Elsayed v F & E Oil, Inc*, 512 Mich 95, 110; 1 NW3d 44 (2023). The threshold question is whether the defendant owed a duty to the plaintiff. *Hill v Sears, Roebuck & Co*, 492 Mich 651, 660; 822 NW2d 190 (2012). "It is axiomatic that there can be no tort liability unless a defendant owed a duty to a plaintiff." *Id*. (quotation marks, citations, and brackets omitted). Determining the presence of a duty "is essentially a question [of] whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person." *Kandil-Elsayed*, 512 Mich at 110 (quotation marks and citation omitted). Plaintiff in this case does not point to any special relationship between Westveld and herself that would give rise to a duty. In fact, under the circumstances, where Westveld had not been present onsite for several days before the injuries and the injuries were caused by a disruption between one surface of the land and another, it is a stretch to think that plaintiff's injuries were caused by anything but a

condition of the land.[4]  Injuries caused by conditions of the land sound in premises liability rather than ordinary negligence.  *James*, 464 Mich at 18-19.

Once this case is viewed under a premises-liability theory, it becomes quite simple. The majority concedes that Westveld did not possess and control the premises at the time of plaintiff's injury.  "The proper inquiry when considering the duty owed in a premises-liability action is who has possession and control over the land where a person was injured . . . ."  *Janini v London Townhouses Condo Ass'n*, 514 Mich 86, 90; 22 NW3d 24 (2024).  Westveld completed its work and departed the premises nine days before plaintiff's fall with no intention or contractual promise to return to perform more work on or near the trench.  Plaintiff clearly fails to demonstrate that Westveld owed her a duty.  *Id*. Accordingly, there can be no tort liability against Westveld, and summary disposition was properly granted because this claim fails as a matter of law.  *Hill*, 492 Mich at 660.

In acknowledging that Westveld lacked possession and control of the land, the majority analyzes the labels of plaintiff's claims and presumes that those labels accurately reflect that this is an ordinary-negligence claim.  But this necessarily disrupts the governing analysis of looking at the substance of the complaint and the source of the injury rather than the legal theory ascribed to that substance by the plaintiff.

Even assuming that this is an ordinary-negligence claim, "[t]o prove ordinary negligence, a plaintiff must demonstrate, among other things, that the defendant owed the plaintiff a duty."  *Meyers v Rieck*, 509 Mich 460, 471; 983 NW2d 747 (2022), citing

---

[4] This is especially true where all parties acknowledge that a separate contractor was retained and expected to complete the work of filling in the trench at issue within a few days.

9

*Murdock v Higgins*, 454 Mich 46, 53; 559 NW2d 639 (1997). I cannot identify a duty that Westveld owed to plaintiff under these particular circumstances. Red Oak controlled and possessed the land, including the trench where plaintiff fell; Red Oak also managed the property and, within that, possessed the statutory duties as well as any additional duties promised through a lease. Red Oak was the most capable actor to identify whether the trench was hazardous; if the trench was hazardous, Red Oak maintained the ability and control to correct the trench with its own resources (by, for example, arranging for a different subcontractor to make the correction, or if Red Oak identified that Westveld's work contributed to a hazard, by calling Westveld back to correct the problem). Those steps—or otherwise—were not taken. Moreover, Bob's Asphalt had contractually promised to fill in the trench with asphalt, so Westveld never accepted any contractual obligations over the area where plaintiff fell. And most importantly, Westveld had fully completed its work several days before plaintiff fell and was not present at or near the time of the fall.

Plaintiff argues that the Court of Appeals' holding that Westveld owed no duty to plaintiff provides contractors with immunity against suit in ordinary negligence and would relegate all contractor liability to that preserved in contract. Our caselaw refutes that argument. In *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 159-160; 809 NW2d 553 (2011), we held that a carpentry and drywall subcontractor may have owed a common-law duty to an employee of an electrical subcontractor who was injured at a construction site where several boards, which had been positioned against the wall with alleged negligence, fell on him. We clarified that the plaintiff's ordinary-negligence claim could survive summary disposition because a subcontractor's duty may arise independently

10

of contract in several ways, including via a special relationship, statutory duties, or generally recognized common-law duties. *Id*. at 170. We noted that the "defendant—by performing an act under the contract—was not relieved of its preexisting common-law duty to use ordinary care in order to avoid physical harm to foreseeable persons and property in the execution of its undertakings." *Id*. at 172; see also *Finazzo v Fire Equip Co*, 323 Mich App 620, 634; 918 NW2d 200 (2018) ("Contractors have a common-law duty to perform their work with ordinary care so as not to unreasonably endanger employees of other subcontractors or anyone else lawfully on the worksite."), citing *Clark v Dalman*, 379 Mich 251, 262; 150 NW2d 755 (1967).

So, under *Loweke*, the contractor's liability includes common-law duties to use ordinary care "in the execution of its undertakings." *Loweke*, 489 Mich at 172. Had plaintiff been injured in the trench while Westveld was performing its work or, at least, while Westveld was maintaining an active presence on the Stanton Park property, *Loweke* would ensure that Westveld had duties required by contract and common law. But here, Westveld had completed its work nine days before any injury occurred, and although *Loweke* does not eliminate common-law duties, it does appear to limit those duties to a reasonable scope of time: during the "execution of [the contractor's] undertakings." *Id*.

Extending the common-law duty of reasonable care to a place and time beyond when Westveld could have had any reasonable control raises many questions. Does the common-law duty extend in perpetuity, or is there a time limit when it may lapse? What is that time limit? One year? One month? Two weeks? Under this holding, it is at least nine days. But from what common law does that extension of Westveld's duty derive? Did Westveld's common-law duty dissipate the moment Bob's Asphalt eventually

11

performed its contractual obligation to fill the trench with asphalt?[5] A simple application of *Loweke* provides a clear answer: the contractor possesses a common-law duty of care during the execution of its undertakings. That means that the contractor's duty of general care applies when the contractor maintains some authority or discretion to act. Since Westveld had completed its work, without incident, nine days prior to plaintiff's fall, under the facts of this case, Westveld owed no duty to plaintiff, and summary disposition was required.

## B. WHETHER RED OAK BREACHED ANY MCL 554.139 DUTIES IS CONTROLLED BY *ALLISON*

MCL 554.139 codifies the statutory rights and obligations that residential lessors covenant to their licensees and lessees. Specific to this case, MCL 554.139(1) requires as follows:

> (1) In every lease or license of residential premises, the lessor or licensor covenants:
>
> (a) That the premises and all common areas are fit for the use intended by the parties.
>
> (b) To keep the premises in reasonable repair during the term of the lease or license, and to comply with the applicable health and safety laws of

---

[5] It is important that Westveld had no control over when Bob's Asphalt performed its work. In a situation in which a contractor hires a subcontractor to finish an aspect of a job, I believe that an honest application of *Loweke* may consider the general contractor's completion of the entire project, inclusive of the subcontracted work, to be within the execution of the general contractor's undertakings. But that situation is inapplicable to the facts before us because the pleadings support that Westveld and Bob's Asphalt were separate contractors hired by Red Oak to perform separate component parts of the renovation project of the dumpster area. There was no privity between Westveld and Bob's Asphalt, so Westveld had no control over when the asphalt was poured and no mechanism for ensuring that the asphalt was poured closer to the completion of its work.

the state and of the local unit of government where the premises are located, except when the disrepair or violation of the applicable health or safety laws has been caused by the tenants [sic] wilful or irresponsible conduct or lack of conduct.

Plaintiff claims that Red Oak failed to keep the premises in reasonable repair, did not comply with the applicable health and safety laws of the state and municipality, and failed to maintain the premises. I agree with the Court of Appeals majority that summary disposition was appropriately granted.

## 1. THE MERE INCONVENIENCE OF ACCESS

In *Allison*, we interpreted MCL 554.139(1) to determine the scope of a lessor's duty to its lessees. The plaintiff in *Allison* was a residential lessee who fell while walking on one to two inches of ice and accumulated snow in his apartment complex's parking lot. *Allison*, 481 Mich at 423. We had to decide whether parking lots in leased residential areas are "common areas" under MCL 554.139(1)(a); whether the hazard of natural accumulation of snow and ice is subject to the duty to keep premises and common areas "fit for the use intended by the parties," MCL 554.139(1)(a); and whether this hazard is subject to the duty to "keep the premises in reasonable repair," MCL 554.139(1)(b). *Allison*, 481 Mich at 422-423.

First, *Allison* expressly held that the duty to repair "does not apply to common areas and, therefore, does not apply to parking lots." *Id*. at 435. Here, the parties seem to agree that the area where plaintiff fell is a common area—the trench between the Red Oak parking lot and the new cement slab holding the communal dumpster. "Because a parking lot within a leased residential property is a common area . . . , the lessor effectively has a contractual duty to keep the parking lot 'fit for the use intended by the parties.' " *Id*. at 429,

13

quoting MCL 554.139(1)(a). " 'Fit' is defined as 'adapted or suited; appropriate,' " *Allison*, 481 Mich at 429, quoting *Random House Webster's College Dictionary* (1997), so, in *Allison*, the lessor had a duty to keep a parking lot adapted or suited for the parking of vehicles, *Allison*, 481 Mich at 429. Fulfilling the obligation to ensure that tenants were able to enter and exit the parking lot, as well as park and access their vehicles, was the extent of the lessor's duty to ensure that the parking lot was fit for the use intended by the parties. *Id*. at 429-430.

As relevant to this appeal, *Allison* held that the parking lot covered by a small amount of snow and ice was fit for the use intended by the parties. The intended use of the parking lot was basic parking and reasonable access to that parking facility and the cars in it. *Id*. at 430. We noted that only two facts supported the plaintiff's allegation of unfitness: that one to two inches of snow covered the lot and that the plaintiff fell; under these two facts, "there could not be reasonable differences of opinion regarding the fact that tenants were able to enter and exit the parking lot, to park their vehicles therein, and to access those vehicles." *Id*. Accordingly, summary disposition was appropriate because the plaintiff could not establish that tenants were unable to use the parking lot for its intended purpose. *Id*. We specified that

> [w]hile a lessor may have some duty under MCL 554.139(1)(a) with regard to the accumulation of snow and ice in a parking lot, it would be triggered only under much more exigent circumstances than those obtaining in this case. The statute does not require a lessor to maintain a lot in an ideal condition or in the most accessible condition possible, but merely requires the lessor to maintain it in a condition that renders it fit for use as a parking lot. *Mere inconvenience of access*, or the need to remove snow and ice from parked cars, *will not defeat the characterization of a lot as being fit for its intended purposes*. [*Id*. (emphasis added).]

14

The majority in *Allison* was accompanied by two separate opinions. The concurrence's "sole area of disagreement" was whether it was necessary to conclude that in more exigent circumstances a natural accumulation of snow or ice could trigger the statutory duty. *Id*. at 439 (CORRIGAN, J., concurring). Justice CORRIGAN thus took no issue with the fact that mere inconvenience of access would not defeat a common area's fitness for the use intended by the parties. Not even the dissent argued against the "[m]ere inconvenience of access" holding but instead disagreed with the way the majority applied it. *Id*. at 446 (M. F. CAVANAGH, J., dissenting) (dissenting because "[t]he majority states that '[m]ere inconvenience' does not make a common area unfit for its intended use. But the ice-covered surface of defendant's parking lot presented a much greater danger to plaintiff than mere inconvenience") (citation omitted).

*Allison* established the following test for determining whether common areas or premises are "fit for the use intended by the parties" under MCL 554.139(1)(a): The statute does not require a lessor to maintain a common area "in an ideal condition or in the most accessible condition possible, but merely requires the lessor to maintain it in a condition that renders it fit for use . . . [;] [m]ere inconvenience of access . . . will not defeat the characterization of a [common area] as being fit for its intended purposes." *Allison*, 481 Mich at 430 (opinion of the Court). Although the *Allison* Court had reasonable disagreement about how to apply MCL 554.139(1)(a), the test was accepted by the entire Court.

## 2. APPLICATION OF *ALLISON*

Although the majority acknowledges that *Allison* is the seminal case addressing MCL 554.139(1), the majority disregards the "[m]ere inconvenience of access" test that *Allison* articulated as the proper lens of analysis for whether common areas or premises were fit for the use intended by the parties under the statute. The majority goes on to fault the Court of Appeals majority and several prior Court of Appeals opinions for determining the fitness for the use intended by the parties through a lens of whether the hazard posed a "[m]ere inconvenience of access." See *Bowerman*, unpub op at 5; *Bowman v Walker*, 340 Mich App 420, 433; 986 NW2d 419 (2022); *Estate of Trueblood v P&G Apartments, LLC*, 327 Mich App 275, 291; 933 NW2d 732 (2019); *Hadden v McDermitt Apartments, LLC*, 287 Mich App 124, 132; 782 NW2d 800 (2010). Next, the majority faults the Court of Appeals opinions decided after *Allison* for "gradually—and improperly—shift[ing] the focus from 'fit[ness] for the use intended by the parties' . . . to the degree of unfitness—with '[m]ere inconvenience of access' . . . becoming a trapdoor in the analysis."[6]

I believe that the Court of Appeals has consistently considered whether a hazard presented a "[m]ere inconvenience of access," which is exactly what we have instructed that Court to do. See *Allison*, 481 Mich at 430 ("Mere inconvenience of access, or the need

---

[6] The majority has not explained how this shift has gradually occurred, because it hasn't. As I go on to explain, Court of Appeals panels since *Allison* have not gradually chipped away at our opinion but rather have applied our caselaw exactly as we have instructed. Certainly, Court of Appeals caselaw has changed over time, but it did not happen gradually; it happened abruptly, and according to our instructions, when, in *Allison*, we overturned the doctrine employed by the Court of Appeals at that time. *Allison*, 481 Mich at 438 ("However, to the extent that *Teufel* [*v Watkins*, 267 Mich App 425; 705 NW2d 164 (2005)] held that a lessor's duty to maintain premises and common areas 'fit for the use intended' under MCL 554.139(1)(a) can *never* include snow and ice removal, we overrule *Teufel*.").

to remove snow and ice from parked cars, will not defeat the characterization of a lot as being fit for its intended purposes."). We have never indicated that *Allison* has been overruled or abrogated, and thus, the Court of Appeals is bound to apply it. See *Associated Builders & Contractors v Lansing*, 499 Mich 177, 192-193; 880 NW2d 765 (2016) ("It is the Supreme Court's obligation to overrule or modify case law if it becomes obsolete, and until this Court takes such action, the Court of Appeals and all lower courts are bound by that authority.") (quotation marks, citation, and brackets omitted); see also *Paige v Sterling Hts*, 476 Mich 495, 524; 720 NW2d 219 (2006) ("[O]nly this Court has the authority to overrule one of its prior decisions. Until this Court does so, all lower courts and tribunals are bound by that prior decision and must follow it even if they believe that it was wrongly decided or has become obsolete."). I do not see how the Court of Appeals has created a "trapdoor in the analysis" by applying the exact test we require it to apply.[7]

The majority cites *Allison*, 481 Mich at 430, to explain that "[t]he extent to which a hazard poses an inconvenience of access may be relevant, but it is not dispositive." However, in *Allison*, we stated that "[m]ere inconvenience of access, or the need to remove snow and ice from parked cars, *will not* defeat the characterization of a lot as being fit for its intended purposes." *Id*. (emphasis added). *Allison* neither used contingent language nor left room for a lower court to conclude both that a hazard in a common area presented a "[m]ere inconvenience of access" and that the common area was still somehow not "fit

---

[7] Moreover, if the Court of Appeals opinions decided after *Allison* were truly the source of origin of the "[m]ere inconvenience" test, it would have been impossible for the Court of Appeals majority in this case to quote *Allison* for the test, as it has. *Bowerman*, unpub op at 4 (" 'Mere inconvenience of access . . . will not defeat the characterization of a lot as being fit for its intended purposes.' "), quoting *Allison*, 481 Mich at 430.

17

for its intended purposes." See *Garner's Dictionary of Legal Usage* (3d ed) (defining the verb "will" as "must; going to; tending to"). This conclusion makes sense: where a condition poses a mere inconvenience, it logically follows that such inconvenience does not render the entire premises unfit for its intended purpose. So, *Allison* requires that when a court concludes that a hazard presents a mere inconvenience of access, the inquiry ends. This Court now suggests that a court may look to other factors upon reaching such a conclusion.

The Court of Appeals majority arrived at the right conclusion. The majority noted that " '[MCL 554.139(1)(a)] does not require a lessor to maintain a lot in an ideal condition or in the most accessible condition possible, but merely requires the lessor to maintain it in a condition that renders it fit for use as a parking lot,' " and that " '[m]ere inconvenience of access . . . will not defeat the characterization of a lot as being fit for its intended purposes.' " *Bowerman*, unpub op at 4, quoting *Allison*, 481 Mich at 430 (first alteration in *Bowerman*). The majority noted that the parking lot in this case had an intended use beyond that in *Allison*: Because the dumpster atop the concrete slab was the only dumpster available to tenants, Red Oak's duty extended to ensuring that the parking lot was fit for reasonable access to the dumpster. *Bowerman*, unpub op at 5. The Court of Appeals majority noted that plaintiff was not forced to encounter the trench, that she had knowledge of its location because she had successfully avoided it when she took out her trash every day for 14 days before her fall, and that Red Oak ensured that the dumpster had two entrances and exits to allow residents to avoid the trench. *Id*. Considering these specific facts, the trench was a mere inconvenience and, thus, the parking lot was fit for its intended use. *Id*., citing *Allison*, 481 Mich at 430.

18

The Court of Appeals majority correctly affirmed the trial court's grant of summary disposition. The Court of Appeals majority reached this holding by applying *Allison*'s "[m]ere inconvenience of access" test exactly as we have previously instructed. There were multiple ways to enter and exit the dumpster area; accordingly, plaintiff had reasonable access to the dumpster area. Plaintiff herself had documented her knowledge of the trench and her ability to avoid it. She has not shown that access to the dumpster was unreasonable. The Court of Appeals majority reached the correct holding in this case, and I would affirm its decision.

### 3. MCL 554.139(1)(a) MOVING FORWARD

The majority opinion modifies the holding of the "seminal case" interpreting MCL 554.139(1)(a) and implies that several Court of Appeals opinions that simply applied this test gradually led us down a legal "trapdoor" and were, thus, incorrectly decided. The majority chooses this path without acknowledging that it is changing the *Allison* test and without analyzing whether stare decisis favors overturning *Allison*. See *Kandil-Elsayed*, 512 Mich at 132-133 (stating that reaching a conclusion that a case must be overruled "requires an analysis of whether it was wrongly decided, 'whether [it] defies "practical workability," whether reliance interests would work an undue hardship, and whether changes in the law or facts no longer justify the questioned decision' "), quoting *Robinson v Detroit*, 462 Mich 439, 464; 613 NW2d 307 (2000) (alteration in *Kandil-Elsayed*). Moreover, no litigants have asked us to overturn *Allison* in this case.

As a result, we are left with two different binding tests for analyzing the same question. It is only a matter of time before a future trial court or Court of Appeals panel is

19

asked to resolve a legal dispute about whether a party was injured by a hazard on a residential property that was allegedly not fit for its intended use. That future court will be aware that our opinions bind its decisions but nonetheless will wonder whether to apply this opinion or *Allison*. See, e.g., *Associated Builders & Contractors*, 499 Mich at 192-193. Is it that "[m]ere inconvenience of access . . . *will not* defeat the characterization of a lot as being fit for its intended purposes"? *Allison*, 481 Mich at 430 (emphasis added). Or is it that "[m]ere inconvenience" is but one relevant factor to consider, as we now hold?[8] Future litigants will be required to determine which of our opinions ought to guide their decisions before they can argue whether the facts require or survive summary disposition.[9]

---

[8] The holding as to Westveld's liability similarly leaves us with many questions and little guidance. When does a contractor cease having common-law duties over the work it performs? When its work is complete? Nine days later? Until some point further in the future?

[9] The majority's analysis of MCL 554.139 purports to be affected by the fact that Stanton Park provides housing for elderly and disabled tenants. The majority states that "[t]o comply with its statutory duty, then, Red Oak was required to ensure that elderly and disabled tenants had reasonable access to a means of disposing of their trash." The majority further states that "the value of such an inquiry (i.e., whether the degree of unfitness is merely inconvenient) is limited, especially in this context, where it relates to residences that specifically house elderly or disabled tenants." This implies that whether a common area is fit for its intended use is influenced by the individual characteristics of those who use that common area. The majority is unable to cite any authority to support this proposition. In fact, the only citation that the majority provides is an excerpt of *Allison* that makes no mention of the characteristics of the person utilizing the pertinent common area. The citation of *Allison* merely explains that the intended use of an apartment complex's parking lot is the parking of vehicles and that a parking lot is generally considered suitable for this intended use if the tenants are able to park their vehicles in the lot and have reasonable access to their vehicles. *Allison*, 481 Mich at 429. The majority declines to acknowledge that on this point, too, it is breaking new legal ground. Nor does the majority attempt to reconcile this proposition with our existing law.

Look no further than plaintiff's pleadings to understand that this proposition is both groundbreaking and completely unsupported by the record. Not once in her pleadings does

20

Rather than overturning *Allison* or continuing to apply *Allison* as the Court of Appeals has done many times since that decision, the majority creates a new test with little guidance on whether a court is to apply *Allison* or this opinion. I am concerned about the confusion that is likely to follow.

---

plaintiff point out that the dumpster area was unfit for the use intended by the parties because of her age or disability. Nor does she mention that Stanton Park holds itself out to house elderly and disabled residents. Nor does she affix a lease agreement indicating that this was specifically agreed upon by the parties. Nor does she raise any allegations that her age or disability made this particular hazard any more dangerous because of her age or disability. Plaintiff raised the issue of her age only once before the trial court, when arguing that Stanton Park violated safety codes, including local statutes and ordinances, not that the premises were unfit for the use intended by the parties. But the question of Stanton Park's compliance with safety codes is not addressed in the majority opinion, nor was it included in our briefing order. *Bowerman v Red Oak Mgt Co, Inc*, ___ Mich ___; 21 NW3d 186 (2025).

Ultimately, the question before us is whether the trial court properly granted summary disposition. Rhetoric that developed through the post hoc appellate process should not be significant grounds for determining whether the trial court did or did not properly grant summary disposition. How can the trial court err by not considering things that are not before it? Plaintiff did not argue before the trial court (a) that the law requires an inquiry into whether an individual resident's characteristics affect the fitness of the premises for the use intended by the parties; (b) that Stanton Park was specifically holding itself out to house elderly or disabled residents; or (c) that plaintiff's own age or disability characteristics somehow modified the hazard she experienced (particularly when she kept detailed notes about her personal knowledge of the hazard and routine ability to avoid it). Without the trial court ever being placed in a position to consider these things, it's difficult to see how the trial court erroneously granted summary disposition through its failure to consider them.

Furthermore, the majority's cursory reliance on the age or disabled status of the Stanton Park residents will likely cause confusion as to how to apply this concept in the future. What percentage of a complex must consist of elderly or disabled residents to affect the condition in which a common area must be maintained? Does the inquiry under MCL 554.139 depend on the unique characteristics of each person who encounters a common area? If so, does that mean that a common area might be fit for its intended use for one tenant but unfit for another?

21

## III.  CONCLUSION

As to Westveld, I would hold that plaintiff's claim sounds in premises liability and fails as a matter of law given that Westveld did not possess and control the premises where plaintiff fell.  And even under ordinary-negligence principles, although a contractor possesses common-law duties while it is performing its work, such duties are limited to the scope of the work.  Accordingly, I would affirm the Court of Appeals' judgment as to Westveld but for different reasons.  As to Red Oak, I would affirm the Court of Appeals' application of the "[m]ere inconvenience" test we articulated in *Allison* unless or until *Allison* is overruled.  Accordingly, I would affirm the Court of Appeals' judgment as to Red Oak.  I respectfully dissent from both key holdings of the majority.


Kyra H. Bolden
Brian K. Zahra

22